# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA      :

     v.                   :   CRIMINAL NO. 21-418

ERIC BOCHENE            :

## GOVERNMENT'S OPPOSITION TO
## DEFENDANT'S MOTION FOR CHANGE OF VENUE

Defendant Eric Bochene is proceeding *pro se* and seeks the transfer of this case to a court in the Northern District of New York where he resides. In support of his Motion, Dkt. 24, the defendant argues that he will be denied a fair trial in the District of Columbia and that "the financial stress and time constraints" that would be put upon him "would cause un-necessary suffrage." For the reasons that follow, the government opposes the defendant's Motion and submits that this Court should try this case in the District of Columbia.

## BACKGROUND AND PROCEDURAL HISTORY

Individuals from all over the United States traveled to Washington, D.C. for the events of January 6, 2021. On that date, as a Joint Session of the United States House of Representatives and the United States Senate convened to certify the vote of the Electoral College of the 2020 U.S. Presidential Election, a large crowd gathered outside the building and, ultimately, forced entry into the U.S. Capitol. These rioters entered the U.S. Capitol without authority to be there. Some engaged in property destruction and violent acts against law enforcement officers. As a result of these acts, the Joint Session and the entire official proceeding of the Congress was halted until law enforcement was able to clear the Capitol of the hundreds of unlawful occupants and ensure the safety of the elected officials.

The defendant was one of the individuals who participated in the attack on January 6, 2021, by unlawfully entering the U.S. Capitol building.  He traveled to the District of Columbia from his home in New York and committed federal crimes in the District.  Specifically, on January 6, 2021, the defendant unlawfully entered the U.S. Capitol building.  While inside the Capitol building, the defendant recorded his movements. Immediately after recording the video, the defendant was interviewed by at least one reporter and shared the video with the reporter(s) and others.

On June 21, 2021, an Information was filed in the District of Columbia charging the defendant with Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1) (Count One); Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(2) (Count Two); Violent Entry and Disorderly Conduct and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Three); and, Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Four). Each of the counts charged alleges that the conduct took place "within the District of Columbia."

The defendant has moved to transfer venue of the trial to the district in which he lives, the Northern District of New York. Def's Mtn. at 2.  Although the defendant's motion lacks reference to a legal basis, he does assert that he would be prejudiced and denied a fair trial by a jury selected from the citizens of the District of Columbia. Therefore, the analysis that follows reflects upon the merits of his arguments pursuant to Federal Rule of Criminal Procedure 21(a). Similarly, because the defendant referred to the inconvenience of a trial in the District of Columbia, his allegations are also considered for convenience pursuant to Federal Rule of Criminal Procedure 21(b).

## ARGUMENT

## I.    LEGAL STANDARD

The United States Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed," U.S. Const. art. III, § 2, cl. 3, before a "jury of the State and district wherein the crime shall have been committed," U.S. Const. amend. VI.  These provisions provide "a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores*, 356 U.S. 405, 407 (1958); *see United States v. Levy Auto Parts*, 787 F.2d 946, 952 (4th Cir. 1986) (noting that the "Constitution requires that local crimes be prosecuted locally").  And they give rise to "a general presumption that a criminal prosecution should be retained in the original district." *United States v. Bowdoin*, 770 F. Supp. 2d 133, 138 (D.D.C. 2011).

With respect to venue, as the United States Supreme Court also noted in *United States v. Anderson,* 328 U.S. 699, 704-705 (1946), "[t]he constitutional specification is geographic; and the geography prescribed is the district or districts within which the offense is committed."  Absent a specific statutory provision defining the place or places at which **venue** will be proper, "the Court must base its determination on 'the nature of the crime alleged and the location of the act or acts constituting it.'"  *United States v. Cores,* 356 U.S. 405, 408 (1958) (quoting *Anderson,* 328 U.S. at 703). See also, *e.g., Platt v. Minnesota Mining & Mfg. Co.,* 376 U.S. 240, 245 (1964); *Travis v. United States,* 364 U.S. 631, 636 (1961); *United States v. Midstate Horticultural Co.,* 306 U.S. 161, 165-166 (1939); *Johnston v. United States,* 351 U.S. 215, 220-221 (1956); *United States v. Lombardo,* 241 U.S. 73, 77 (1916).

Federal Rule of Criminal Procedure 21(a) allows a court to transfer venue of a case "if

3

the court is satisfied that so great a prejudice against the defendant exists" such that "the defendant cannot obtain a fair and impartial trial" in the local District. *See Skilling v. United States*, 561 U.S. 358, 378 n.11 (2010) (noting that Rule 21(a) allows venue transfer only if "extraordinary local prejudice will prevent a fair trial"). This is an exacting standard, and one that is infrequently met.

It is the defendant's burden to establish his entitlement to a transfer of venue under Rule 21(a). *United States v. Caldwell*, 543 F.2d 1333, 1342 (D.C. Cir. 1974). The en banc D.C. Circuit has explained that a pre-voir dire request for a change of venue may be warranted only in "extreme circumstances," and that an "extensive voir dire" can usually assure that a defendant is "tried by an unbiased jury capable of basing its verdict solely on the evidence introduced at trial." *United States v. Haldeman*, 559 F.2d 31, 60, 70 (D.C. Cir. 1976) (en banc) (per curiam).

Many court cases have generated significant publicity, both locally and nationally. But "[p]rominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require *ignorance*." *Skilling*, 561 U.S. at 381 (emphasis in original). Indeed, appellate courts have uniformly affirmed the denial of pre-trial transfer motions in some of the most notorious cases in this country's recent history: Dzhokhar Tsarnaev, one of the Boston Marathon bombers; Jeffrey Skilling, a longtime Enron executive; Zacharias Moussaoui, who conspired to commit the September 11 terrorist attacks; Ramzi Yousef and others who committed the 1993 World Trade Center bombing; and, in this jurisdiction, former Attorney General John Mitchell and others charged as part of the Watergate scandal. *See Skilling*, 561 U.S. at 399; *In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (per curiam); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003); *Haldeman*, 559 F.2d at 70.

The same holds true here. As in *Haldeman* and other heavily publicized cases from this

jurisdiction and elsewhere around the country, extensive pre-trial screening and voir dire will suffice to ensure that the defendant receives a fair trial by an unbiased jury in the District of Columbia.

Federal Rule of Criminal Procedure 21(b) provides that "for the convenience of parties and witnesses, and in the interest of justice, the court upon motion of the defendant may transfer the proceeding as to that defendant . . . to another district." Fed. R. Crim. P. 21(b). "In *Platt*, the Supreme Court provided guidance for lower courts for determining whether to grant a motion to transfer venue in a criminal case pursuant to Rule 21(b)." *United States v. Hassanshahi*, No. CR 13-0274, 2015 WL 7307079, at \*2 (D.D.C. Nov. 19, 2015). The *Platt* Court identified ten factors that are germane to a transfer decision under Rule 21(b), which are: location of the defendant; location of possible witnesses; location of events likely to be in issue; location of documents and records likely to be involved; disruption of defendant's business; expense to the parties; location of counsel; relative accessibility of the place of trial; docket condition of each district; and other special elements which might affect the transfer. *United States v. Bowdoin*, 770 F. Supp. 2d 133, 137–38 (D.D.C. 2011).

In the context of Rule 21(b), Judge Howell, a member of this District Court, stated: "[c]ourts have imposed a heavy burden on those who seek transfer and court will not order transfer unless the balance [of the *Platt* factors] is strongly in favor of the defendant." *United States v. H & R Block, Inc.*, 789 F.Supp.2d 74, 78 (D.D.C. 2011) (citations omitted).

## II.   THE CASE SHOULD NOT BE TRANSFERRED PURSUANT TO RULE 21(a)

### A.   The Defendant's Motion to Transfer is Premature.

Under longstanding D.C. Circuit precedent, the proper time for a court to evaluate a motion for a transfer of venue based upon prejudice is after voir dire.  In the overwhelming

majority of cases, thorough juror screening and extensive voir dire are sufficient to ensure that all

seated jurors can be fair and impartial and to provide criminal defendants with the fair trial to

which they are entitled.

As the D.C. Circuit has explained, "[t]he ultimate question" on a motion to transfer venue

based upon prejudicial pretrial publicity "is whether it is possible to select a fair and impartial

jury, and the proper occasion for such a determination is upon the voir dire examination." *Jones*

*v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967) (internal citation and quotation omitted). "[I]f

an impartial jury actually cannot be selected, that fact should become evident at the voir dire.

The defendant[s] will then be entitled to any actions necessary to assure that [they] receive[] a

fair trial." *Haldeman*, 559 F.2d at 63. Consistent with this approach, notwithstanding the

"extraordinarily heavy coverage in both national and local news media" that the Watergate

scandal received, the court in *Haldeman* held that "the District Court was correct to follow this

circuit's well established procedure by refusing [the defendants'] pre-voir dire requests for . . . a

change of venue." *Id.* at 59, 63-64.

Other courts agree that "the preferable procedure" is for a trial court to defer decision on

a motion to transfer based on prejudicial pretrial publicity until after it has conducted voir dire.

*See United States v. Campa*, 459 F.3d 1121, 1146-47 (11th Cir. 2006) ("Indeed, we have ruled

that a trial court's method of holding its decision on a Rule 21 motion for change of venue in

abeyance until the conclusion of the voir dire is clearly the preferable procedure.") (internal

quotation omitted); *see also United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) ("[T]he key

to determining the appropriateness of a change of venue is a searching voir dire of the members

of the jury pool."); *United States v. Bakker*, 925 F.2d 728, 732 (4th Cir. 1991) ("Only where voir

dire reveals that an impartial jury cannot be impaneled would a change of venue be justified.");

*United States v. Poludniak*, 657 F.2d 948, 955 (8th Cir. 1981) ("This court has repeatedly held that it is preferable to await voir dire before ruling upon motions for change of venue."); *United States v. Gullion*, 575 F.2d 26, 28 (1st Cir. 1978) ("We find that the trial judge did not abuse his discretion in denying the motion for a change of venue until he could consider the effect of any pretrial publicity at the time of conducting the voir dire of prospective jurors."); *United States v. Williams*, 523 F.2d 1203, 1209 n.10 (5th Cir. 1975) ("Holding a final decision on the motion in abeyance pending the conclusion of voir dire is clearly the preferable procedure."). As the Seventh Circuit has explained, it is "ordinarily preferable to assess the impact of the pretrial publicity through an extensive voir dire of the prospective jurors, instead of in the vacuum of a hearing without reference to prospective jurors." *United States v. Peters*, 791 F.2d 1270, 1295 (7th Cir. 1986).

The D.C. Circuit has historically preferred voir dire of potential jurors as a means of dealing with pretrial publicity, and the Supreme Court has not barred a court from deferring the decision on a change of venue motion until voir dire. If the jury pool might not be impartial, voir dire will lead to that determination. *See United States v. Edmond*, 52 F.3d 1080, 1097 (D.C. Cir. 1995) ("The results of the *voir dire* itself demonstrate that the community was not inflamed against the defendants."). Indeed, although the events that took place at the U.S. Capitol Building on January 6, 2021, received vast media attention, it is unlikely that any member of the District's population knew the defendant by name, much less the crimes that he is accused of committing. *See id.* ("As we have discussed, less than a third of all prospective jurors ever *had heard* of any of the defendants from the media, much less formed an opinion about their guilt."). Even if they had, "the mere fact that trial jurors have *heard of* a defendant does not give rise to the assumption that they are *prejudiced against* the defendant except in cases of extremely

prejudicial pretrial publicity." *Id.*  And, as the D.C. Circuit found in *Haldeman*, it is possible in this District to select "an unbiased jury capable of basing its verdict solely on the evidence introduced at trial" even when an overwhelming percentage of the potential jurors have heard of a defendant and their crimes and have formed an opinion of the defendant's guilt.  559 F.2d at 70, 144.

The defendant does not cite to a case that supports his argument that a transfer is warranted and, under the circumstances that exist here, the government is incapable of identifying one.  In fact, the government acknowledges that in the Oklahoma City bombing case, the parties did not disagree about transferring venue out of the district encompassing Oklahoma City (whose federal courthouse was itself damaged during the bombing).  *United States v. McVeigh*, 918 F. Supp. 1467, 1470 (W.D. Okla. 1996).  The court stressed that "[o]rdinarily, the effects of pre-trial publicity on the pool from which jurors are drawn is determined by a careful and searching voir dire examination.  That is the preferred practice."  *Id.*  And, in a perjury case related to the September 11 attacks, *after the court had conducted a careful voir dire*, the court opined in dicta that had the defendant been charged with committing the attacks, "it is possible to imagine that the prejudice in this case would be comparable to the community scrutiny and outrage that justified a change of venue in *McVeigh*."  *United States v. Awadallah*, 457 F. Supp. 2d 246, 252 (S.D.N.Y. 2006).  But he was not, and voir dire was able to ensure an impartial jury. *Id.*

In any event, because the question whether it is possible to select a fair and impartial jury is one that can only be answered after a thorough voir dire, this Court should follow the D.C. Circuit's well-established procedure and deny the defendant's pretrial motion for change of venue.

**B.      The Defendant Has Not Established Circumstances So Extreme As To Warrant A Presumption of Prejudice.**

The Supreme Court has recognized that there may arise a "presumption of prejudice" resulting from sufficiently prejudicial pretrial publicity, but that presumption is appropriate "only [in] the extreme case." *Skilling*, 561 U.S. at 381.  "[N]ews accounts of the crime" do not "alone presumptively deprive[] the defendant of due process." *Murphy v. Florida*, 421 U.S. 794, 799 (1975).  Jurors are not required to be "totally ignorant of the facts and issues involved," as "scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  And "pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976).  Consistent with these well-established principles, courts have declined to transfer venue in some of the most high-profile prosecutions in recent American history, as cited above.

In none of these cases did the courts apply a presumption of prejudice arising from extensive pretrial publicity of the defendants' crimes.  Indeed, as discussed below, the D.C. Circuit appears to have never applied such a presumption.  And the Supreme Court has done so in only three "extreme" cases: *Rideau v. Louisiana*, 373 U.S. 723 (1963); *Estes v. Texas*, 381 U.S. 532 (1965); and *Sheppard v. Maxwell*, 384 U.S. 333 (1966).  In *Rideau*, the defendant's confession—obtained while he was in jail and without an attorney present—was broadcast three times shortly before trial on a local television station to audiences ranging from 24,000 to 53,000 individuals in a parish of approximately 150,000 people.  *See Skilling*, 561 U.S. at 379 (describing *Rideau*).  The Court presumed prejudice because, "to the tens of thousands of people who saw and heard it," the televised confession "in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder." *Rideau*, 373 U.S. at 726.  In *Estes*, "extensive publicity

before trial swelled into excessive exposure during preliminary court proceedings as reporters and television crews overran the courtroom and 'bombard[ed] . . . the community with the sights and sounds of' the pretrial hearing. The media's overzealous reporting efforts . . . 'led to considerable disruption' and denied the 'judicial serenity and calm to which [Estes was entitled.'" *Skilling*, 561 U.S. at 379-80 (quoting *Estes*, 381 U.S. at 536). And in *Sheppard*, "a 'carnival atmosphere' pervaded the trial": "'[B]edlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom,' thrusting jurors 'into the role of celebrities.'" *Id.* at 380 (quoting *Sheppard*, 384 U.S. at 353, 355, 358).

Notably, in *Sheppard*, the Court found that "months" of "virulent publicity about Sheppard" and his crime—including "a three-day inquest" during which "Sheppard was examined for more than five hours without counsel" that was "televised live" and "ended in a public brawl"—did not by itself deny the defendant his right to due process. 384 U.S. at 354; *see Skilling*, 561 U.S. at 380 ("Pretrial media coverage, which we characterized as 'months [of] virulent publicity about Sheppard and the murder,' did not alone deny due process.") (internal citation omitted). Nor has either the Supreme Court or the D.C. Circuit presumed prejudice in any case in the 55 years since *Sheppard* was decided. To the contrary, in *Patton v. Yount*, the Supreme Court held that the trial court did not err "in finding that the jury as a whole was impartial" even where "voir dire showed that all but 2 of 163 veniremen questioned about the case had heard of it, and that, 126, or 77%, admitted they would carry an opinion into the jury box." 467 U.S. at 1029, 1032 (1984). In *Mu'Min v. Virginia*, the Court declined to presume prejudice despite "substantial" pretrial publicity that "w[as] not favorable" to the defendant. 500 U.S. 415, 429 (1991). And in *Skilling*, the Court refused to presume prejudice notwithstanding "the magnitude and negative tone of media attention directed at Enron" because of the "large,

diverse pool of potential jurors" in the Houston area; the fact that, "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight;" "over four years [had] elapsed between Enron's bankruptcy and Skilling's trial;" and "Skilling's jury acquitted him of nine insider-trading counts." 561 U.S. at 382-83.

Similarly, in *Haldeman*, the D.C. Circuit declined to find that the defendants' "due process rights were violated by the District Court's refusal to grant . . . a change of venue prior to attempting selection of a jury" notwithstanding the "massive," sometimes "hostile in tone and accusatory in content," pretrial publicity. 559 F.2d at 61-62. The court explained that, "unlike the situation faced by the [Supreme] Court in *Rideau*," the publicity surrounding Watergate gave the court "no reason for concluding that the population of Washington, D.C. was so aroused against [the defendants] and so unlikely to be able objectively to judge their guilt or innocence on the basis of the evidence presented at trial that their due process rights were violated." *Id.* The D.C. Circuit has similarly refused to presume prejudice in numerous other cases involving both national crimes such as Watergate and notorious local criminals. *See, e.g.*, *United States v. Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995) (declining to presume prejudice, which "is reserved for only the most egregious cases"); *Edmond*, 52 F.3d at 1099 ("Neither the nature nor the impact of the publicity in this case presented the 'extreme circumstances' necessary to establish a presumption that a fair trial was impossible in this jurisdiction."); *United States v. Ehrlichman*, 546 F.2d 910, 916 n.8 (D.C. Cir. 1976) ("An examination of the voir dire process and its results in this case makes clear that the extreme circumstances condemned by the Supreme Court in . . . *Sheppard* . . . and *Rideau* . . . are not present here."); *United States v. Chapin*, 515 F.2d 1274, 1287 (D.C. Cir. 1975) (rejecting "the argument [] that no voir dire would have been effective in

rooting out the prejudices of which [the defendant] complains").

This case is nothing like the few "extreme case[s]" in which the Supreme Court has presumed prejudice based upon adverse pretrial publicity. The news stories about this defendant have "contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382. Indeed, given the sheer number of people involved in the attack on the Capitol, it is unlikely that more than a handful of District residents could identify this defendant or any of others charged in similar cases by name. Any reporting done on this defendant contains nothing resembling a confession, and thus is entirely dissimilar from *Rideau*, where "[w]hat the people of Calcasieu Parish saw on their television sets was Rideau, in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder, in response to leading questions by the sheriff." 373 U.S. at 725. Whereas "Rideau's dramatically staged admission of guilt . . . was likely imprinted indelibly in the mind of anyone who watched it," *Skilling*, 561 U.S. at 382-83, the defendant has provided no reason to believe that, by the time his trial begins, jurors in this District are likely to be able to remember and distinguish the reporting about this defendant from that involving the many hundreds of other people charged as part of the attack on the Capitol. And even if they could, "[p]rominence does not necessarily produce prejudice." *Id.* at 381.

The size of the District's population likewise distinguishes it from those few cases in which the Supreme Court has presumed prejudice. The Census Bureau estimates the District's population to be around 705,000 people, *see* QuickFacts, District of Columbia, *available at* https://www.census.gov/quickfacts/DC, far more than the 150,000-person Louisiana parish at issue in *Rideau*, 373 U.S. at 724. Indeed, the District is more populous than the 600,000-resident

Clark County was in 1988, but a four-Justice plurality nonetheless concluded in *Gentile v. State Bar of Nevada* that there was a reduced likelihood of prejudice there "[g]iven the size of the community from which any potential jury venire would be drawn." 501 U.S. 1030, 1044 (1991).

Although there has been substantial publicity surrounding the attack on the Capitol, that reporting has largely focused on the attack generally—publicity has also been nationwide, not merely "local." *Skilling*, 561 U.S. at 378; *see, e.g.*, *In re Tsarnaev*, 780 F.3d at 22 ("It is true that there has been ongoing media coverage of the advent of the trial and petitioner's pre-trial motions, both locally and nationally. But that would be true wherever trial is held, and the reporting has largely been factual."); *Haldeman*, 559 F.2d at 64 n.43 (noting that "a change of venue would have been of only doubtful value" where the pretrial publicity was nationwide in scope and where the crime was "simply not a local [one] of peculiar interest to the residents of the District of Columbia"). Finally, this Court can take measures to prevent a "carnival atmosphere" from pervading the defendant's trial and denying him "judicial serenity and calm" to which he is entitled. *See Sheppard*, 384 U.S. at 358 ("The carnival atmosphere at trial could easily have been avoided since the courtroom and courthouse premises are subject to the control of the court.").

The defendant nonetheless argues that the court should transfer this case *now*, without first conducting voir dire to evaluate whether it is possible to select an impartial jury, on the ground that because of "the present social climate and tension of the event that transpired on January 6th of 2021," he would be denied his Constitutional rights to a fair trial by a jury of his peers. Def's Mtn. at 2. He further argues that data suggests that one-third of the population of the District of Columbia are federal employees and are, therefore, biased toward the federal government. *Id.* For these unsubstantiated reasons, the defendant moves this Court to forego

even attempting to pick a fair and impartial jury in this case.

As previously discussed, the D.C. Circuit rejected just a somewhat similar argument in *Haldeman*, 559 F.2d at 64 n.43. There, the defendants were not just vocal supporters of President Nixon, but were former high-ranking officials in his administration. *Id.* at 51. And the defendants were not among many hundreds charged in a high-profile crime of nationwide significance, but were instead just seven, nationally known figures "charged [in] what amounted to an unprecedented scandal at the highest levels of government," that "led to the resignation of President Nixon." *Id.* at 51, 54 n.15. Notwithstanding the fact "that Washington, D.C. is unique in its overwhelming concentration of supporters of the Democratic Party, as opposed to the Republican Party to which the defendants . . . belonged," and that roughly 80% of the voters in D.C. voted for the Democratic Party candidate when Nixon ran for president in 1968 and 1972, *id.* at 160, there was no legal support for the proposition "that a community's voting patterns are at all pertinent to venue." *Id.* at 64 n.43. Significantly, although 93% of the Washington, D.C., population knew about the charges against the *Haldeman* defendants and 73% of those individuals had an opinion of the defendants' guilt or innocence, *id.* at 144, the court of appeals nonetheless held that the district court "was correct to follow this circuit's well established procedure by refusing [the defendants'] pre-voir dire requests for . . . a change of venue." *Id.* at 63-64. And it found that an "extensive voir dire" ultimately assured that the defendants "were tried by an unbiased jury capable of basing its verdict solely on the evidence introduced at trial." *Id.* at 70. If "the District of Columbia's voting record in the past two presidential elections" is not relevant to venue in a case involving high-ranking members of the president's administration, *id.* at 64 n.43, it surely has no bearing on venue here.

As the nation's capital and seat of the federal government, the District has been home to

its fair share of trials in politically charged cases.  High-profile individuals such as Oliver North,

John Poindexter, Scooter Libby, and, more recently, Roger Stone, all received fair trials in this

jurisdiction by unbiased juries.  *See United States v. North*, 910 F.2d 843 (D.C. Cir. 1990);

*United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991); *United States v. Libby*, 498 F. Supp.

2d 1 (D.D.C. 2007); *United States v. Stone*, No. 19-cr-0018 (ABJ), 2020 WL 1892360 (D.D.C.

April 16, 2020).  In *Stone,* the court explained that "[t]he case law in this Circuit makes it clear

that one cannot assume that people in the community—even those who follow the news—have a

deep understanding of the facts of a particular case.  During the prosecutions that arose out of the

Watergate and Iran-Contra investigations, the Court of Appeals repeatedly expressed its

confidence that jurors with open minds could be found within the District, even though the

investigations had received a great deal of public attention."  *Id.* at *31.  The same is true here.

Ultimately, the defendant attempts to demonstrate that this Court should presume

prejudice and transfer his case without even attempting to choose an impartial jury here.  The

Supreme Court identified four "[i]mportant differences" in Skilling's prosecution from cases

with a "presumption of juror prejudice": (1) size and characteristics of the community, (2) type

of information being reported about the defendant(s), (3) time elapsed between the crime and the

trial, and (4) whether the jury's verdict in the case or related cases indicates impartiality.

*Skilling*, 561 U.S. at 381-84.  As discussed above, the first two factors weigh heavily against

presuming prejudice.  The third factor cannot be determined as the Court has not set a trial date,

but it is estimated that any trial in this matter will occur over a year after the attack on the

Capitol.  *Cf. Rideau*, 373 U.S. at 728 (Clark, J., dissenting) (noting that trial commenced within

two months of the murder).  The fourth factor—whether the jury's verdict indicates

impartiality—is also unknowable at this stage.

Courts routinely conclude that, despite significant negative pretrial publicity, defendants typically receive a fair trial in the location where they committed their crimes.  This was true in *Skilling*, notwithstanding "the community passion aroused by Enron's collapse and the vitriolic media treatment" aimed at Skilling.  561 U.S. at 377.  This was true for Dzhokhar Tsarnaev, one of the Boston Marathon bombers, notwithstanding the fact that "the reporting of the events" in that case "st[ood] unrivaled in American legal history (at least as of today)."  *Tsarnaev*, 968 F.3d at 42.  It was true for Zacharias Moussaoui, who was prosecuted "in the Eastern District of Virginia, minutes by car from the Pentagon."  *In re Tsarnaev*, 780 F.3d at 16; *see Moussaoui*, 43 F. App'x at 613.  It was true in the World Trade Center Bombing case.  *See Yousef*, 327 F.3d at 155.  It was true in the post-Watergate prosecutions.  *See Haldeman*, 559 F.2d at 70-71.  And it is true here, too.

But the question whether the Court ultimately can select an impartial jury for the defendant's trial is one that the Court need not answer today.  Rather, the question before the Court at this time is whether to presume that, whatever jury it picks, and whenever it picks that jury, the defendant cannot possibly receive a fair trial in this jurisdiction.  Because such a presumption has no legal or factual support in this case and runs counter to the D.C. Circuit's "well established procedure" against answering that question before conducting voir dire, the Court should deny the defendant's motion.

## II.   THE CASE ALSO SHOULD NOT BE TRANSFERRED PURSUANT TO RULE 21(b)

Alternatively, the defendant bases his motion to transfer his case on the position that a trial in the District of Columbia, as opposed to the Northern District of New York where he resides, would be an inconvenience to him. In making this argument, he relies upon two factors: his location and his expense. These two factors are among the ten identified by the Supreme

16

Court that should be weighed in determining whether to transfer venue in a case.

Although the location of the defendant is one factor, the Supreme Court stated in *Platt* that the defendant is not entitled to have his case in his home district. 376 U.S. at 245-46; *see also, United States v. Quinn,* 401 F. Supp. 2d 80, 86-87 (D.D.C. 2005) and *Bowdoin*, 770 F. Supp. 2d at 138. The location of a defendant's residence, standing on its own, should have no independent significance in determining whether transfer to a different district would be in the interests of justice. This conclusion was made clear in *Jones v. Gasch,* 404 F.2d 1231, 1240 (D.C. Cir. 1967), where the Court noted that although the defendant's residence is a factor, it is not a controlling factor and its significance must be balanced against the other factors, including the location of witnesses, events, counsel, and expense to the parties.

Therefore, simply because the defendant resides in the Northern District of New York, he is not entitled to a change of venue to that district.

As to the second circumstance raised by the defendant, that is, his expense, he states that a trial in the District of Columbia "would cause un-necessary suffrage to me given fuel costs, travel times and accommodations and preparation for trial . . . ." Def's Mot. at 2. Certainly the Court is familiar with the defendant's financial condition after he provided a post-arrest financial statement and, based on the provided information, appointed him counsel. Thus, the difficulty the defendant may face in meeting his financial obligations and the costs he will incur as a result of a trial in the District of Columbia are relevant. However, *Platt* specifically calls for the court to consider the "expense to the parties," rather than solely the expense to the defendant.

It is worth noting that the defendant voluntarily traveled to and from New York to Washington, D.C. on January 6, 2021, demonstrating his ability to incur the expense of traveling to the District of Columbia from his home district. Despite the Court having appointed counsel to

17

represent him, the defendant has chosen to represent himself. Therefore, the cost of litigation is a choice made by the defendant.

   The defendant also completely ignores the tremendous expense that would be incurred by the government which has investigated and charged the defendant in the District of Columbia if the case were to be transferred to the Northern District of New York. Were this case to be transferred to that judicial district, the Government would have to move the Assistant United States Attorney, a paralegal, and its witnesses to the Northern District of New York in order to conduct the trial. The expense of the transfer to the Government would be significant.

   Essentially, what the defendant is seeking is to shift the economic burden to the government. Furthermore, while the defendant complains about the personal costs of travel to the District of Columbia, he overlooks or is unaware that he may apply to have his travel expenses paid by the United States Marshals.

   In *Quinn,* this Court noted, "[i]t is not appropriate to focus on Defendants' financial means when there is no clear evidence that transfer will result in lower total litigation costs for the parties." 401 F. Supp. 2d at 88. Based on the record that the defendant has made here, there is no clear evidence that the total expense to the parties would be measurably less if this case were to be transferred from the District of Columbia to the Northern District of New York.

   Accordingly, the defendant has not met his burden of showing that any added expense of trying this case in the District of Columbia warrants a transfer in the interests of justice.

   While the government submits that the defendant has waived argument with regard to the remaining *Platt* factors in seeking a transfer of this case for trial in the Northern District of New York, even assuming arguendo, none of the other factors weigh in favor of transfer of the case. In sum, the government anticipates that most of its witnesses are located either in or in close

proximity to the District of Columbia. The discovery materials in this case originated in the District of Columbia and were converted into electronic format and produced to the defendant and his stand-by counsel and the electronic devices that contained discovery were imaged and returned to the defendant. There is no evidence that a trial would disrupt his business, to the extent that he has any and the trial in this case would be of a short duration. While the defendant and his stand-by counsel are located in the Northern District of New York, counsel for the Government is located in the District of Columbia. Whether it be by airplane, train, bus, or automobile, the Government submits that the District of Columbia is more accessible to the parties and the anticipated witnesses. The defendant did not address the relative docket conditions of the Northern District of New York and this Court has not indicated to either party that this case will impair its docket. Finally, the defendant has failed to identify any other special elements which might affect the transfer. On balance, these additional factors strongly tip the scale against transfer of the case to the Northern District of New York.

Analysis of the relevant *Platt* factors makes clear that the defendant has failed to meet his burden of demonstrating that a transfer of this case to the Northern District of New York is required "in the interests of justice." Fed. R. Crim. P. 21(b). Instead, the defendant has done no more than establish the ordinary inconvenience and interference with normal personal activities that occur whenever a defendant is standing trial for serious criminal charges.

## CONCLUSION

For the reasons discussed above, and for any other reasons the Court deems appropriate,

the Government respectfully requests the Defendant's Motion for a Change of Venue be denied.

Respectfully submitted,

MATTHEW GRAVES
United States Attorney
D.C. Bar No. 481052

/s/ *Anita Eve*
ANITA EVE
Assistant United States Attorney (Detailee)
PA Bar No. 45519
United States Attorney's Office
District of Columbia
Cell No. (215) 764-2177
Anita.eve@usdoj.gov

## CERTIFICATE OF SERVICE

On this 12th day of November 2021, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System and to defendant Eric Bochene at mail@sansmemetics.net.


*/s/ Anita Eve*
Anita Eve
Assistant United States Attorney